## NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-860

STATE OF LOUISIANA

VERSUS

MELVIN E. JOHNSON

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT,
PARISH OF VERNON, 71830 and 71839
HONORABLE JOHN C. FORD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

J. DAVID PAINTER
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy Howard Ezell, and J. David Painter, Judges.

AFFIRMED.

Mark Kramar, Assistant District Attorney
Thirtieth Judicial District
P.O. Box 1188
Leesville, LA 71496
(337) 239-2008
Counsel for State of Louisiana

Edward K. Bauman, Attorney at Law
Louisiana Appellate Project
P.O. Box 1641
Lake Charles, LA 70602
(337) 491-0570
Counsel for Defendant-Appellant:
    Melvin E. Johnson

**PAINTER, Judge.**

Defendant, Melvin E. Johnson, pled guilty to the charge of possession of cocaine, in violation of La.R.S. 40:967, and expressly reserved his right to seek review of the trial court's denial of his motion to suppress under *State v. Crosby*, 338 So.2d 584 (La.1976). We find no abuse of discretion in the trial court's denial of Defendant's motion to suppress and affirm his conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 20, 2007, the State charged Defendant with four offenses via two separate bills of information: possession of cocaine, possession of cocaine with intent to distribute, resisting arrest, and possession of a firearm by a convicted felon. On May 30, 2007, Defendant filed a motion to suppress all evidence derived from the search of Defendant as well as all statements made by Defendant. Defendant's motion further alleged that the entry into his home had been unlawful and without permission. The motion further asserted the subsequent search warrant contained false and misleading information.

The trial court conducted a suppression hearing, and, on September 24, 2007, it denied Defendant's motion and stated: "Considering arguments of counsel and the law and evidence, the Court concludes that the officer's conduct in entering the mobile home was reasonable where he had determined, by questioning a witness at the scene, that gunshots had occurred in the mobile home."

Thereafter, Defendant entered into a plea agreement with the State wherein he pled guilty to possession of cocaine, in violation of La.R.S. 40:967, and expressly reserved his right to seek review of the trial court's ruling on his motion to suppress pursuant to *Crosby*. In exchange for the plea, the State dismissed the remaining charges against Defendant.

1

After reviewing the pre-sentence investigation report, the trial court ordered Defendant to serve five years at hard labor, suspended, with five years of supervised probation and credit for time served. The trial court also fined Defendant $2,500 plus court costs.

Defendant now appeals the trial court's ruling on his motion to suppress. For the following reasons, we uphold the trial court's ruling and affirm Defendant's conviction.

**DISCUSSION**

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent. However, we find that the issue is waived.

In this case, there was a misjoinder of offenses in the bill of information filed in district court docket number 71839. In a single bill of information, the State charged Defendant with a felony, possession of cocaine, a violation of La. R.S. 40:967, and a misdemeanor, resisting arrest, a violation of La. R.S. 40:108. Louisiana Code of Criminal Procedure Article 493 provides for the joinder of offenses in a single bill of information under limited circumstances, if the offenses joined are triable by the same mode of trial. The offense of resisting arrest is triable by a judge only, whereas the offense of possession of cocaine is triable by a jury. La.R.S. 40:967 and 14:108, and La.Code Crim.P. arts. 779 and 782. Because Defendant was entitled to a jury trial for the felony charge but was not entitled to a jury trial on the misdemeanor charge, the offenses were not triable by the same mode of trial and should not have been charged in the same bill of information. La.Code Crim.P. art. 493. However, because Defendant failed to file a motion to quash the bill of

2

information based on the misjoinder, he waived any objection to the error. La.Code Crim.P. art. 495 and *State v. Mallett*, 357 So.2d 1105 (La.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 848 (1979).

*Motion to Suppress*

In his only assignment of error, Defendant contends the trial court erred in failing to grant his motion to suppress. Defendant urges that the facts of his case show that law enforcement personnel had neither probable cause nor exigent circumstances to validate their entry into his home. The State responds that, after learning that there had been an argument and that gunshots had recently been fired inside the trailer, law enforcement had the exigent circumstances necessary to enter the home in order to protect the life and well-being of potential victims.

This court has determined that the proper standard for reviewing motions to suppress is abuse of discretion:

> When a trial court rules on a defendant's motion to suppress, the appellate court must look at the totality of the evidence presented t the hearing on the motion to suppress. The appellate court should not overturn a trial court's ruling, unless the trial court's conclusions are not supported by the evidence, or there exists an internal inconsistency in the testimony of the witnesses, or there was a palpable or obvious abuse of discretion.

*State v. Bargeman*, 98-617, p. 5 (La.App. 3 Cir. 10/28/98), 721 So.2d 964, 967, *writ denied*, 99-33 (La. 5/28/99), 743 So.2d 658. The State bears the burden of proving the admissibility of evidence seized without a warrant. La.Code Crim.P. art. 703(D).

The supreme court has recently discussed the warrant requirement in the context of exigent circumstances:

> Police generally need a warrant to enter a home, but "warrantless searches will be allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." One such circumstance is when the police "reasonably fear[ ] for the safety of someone inside the premises." The safety of others is a particular concern when police respond to a report

3

of a crime in progress, and, in such a situation, police judgments regarding warrantless entries "should be afforded an extra degree of deference." To justify a warrantless entry, the exigent circumstances must be known to the officers "at the time of the warrantless entry" and cannot be based on evidence discovered during the search.

In order to justify a warrantless entry based on exigent circumstances, there must also be probable cause to enter the residence. Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." This determination must be made from the totality of the circumstances, based on the objective facts known to the officer at the time. In determining whether sufficient exigent circumstances exist to justify the warrantless entry and search or seizure, the court must "consider the totality of the circumstances and the 'inherent necessities of the situation at the time.'" Further, the scope of the intrusion must be circumscribed by the exigencies that justified the warrantless search.

. . . [T]he Federal United States Appellate Court noted examples of exigent circumstances that included, but were not limited to hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others. In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion. Exigent circumstances, however, do not meet Fourth Amendment standards if the government deliberately creates them.

The " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,' " and accordingly, warrantless entries are considered presumptively unreasonable. The relevant focus is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed or removed before a warrant could be secured.

Exigent circumstances justify a warrantless entry, search, or seizure when "police officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons." The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances.

With the exception of a few well-delineated situations, officers must obtain a warrant from a neutral and detached magistrate prior to conducting either an arrest or a search. The warrant requirement limits

police discretion in determining which persons to search or seize.[1] Absent one of the foregoing exceptions, a warrant is required because it places the crucial task of making delicate judgments and inferences from facts and circumstances in the hands of a detached and neutral magistrate judge, instead of police officers, who are engaged in the zealous pursuit of ferreting out crime.

A search and seizure conducted without a warrant issued on probable cause is *per se* unreasonable unless the warrantless search and seizure can be justified by one of the narrowly drawn exceptions to the warrant requirement. When the constitutionality of a warrantless search or seizure is placed at issue by a motion to suppress the evidence, the State bears the burden of proving the admissibility of any evidence seized without a warrant. LSA-C.Cr.P. art. 703(D).

*State v. Warren*, 05-2248, pp. 9-13 (La. 2/22/07), 949 So.2d 1215, 1224-26 (first alteration in original; footnotes, case citations, and parentheticals omitted).

One witness, Officer Ethan Crockett, testified at the suppression hearing. In the course of his duties on the morning of December 17, 2006, Officer Crockett, who was a patrol shift supervisor for the Vernon Parish Sheriff's Office, arrested four people at a specific address in Jean Chapel Trailer Park, namely Defendant, Jeremy Buckner, Reggie Buckner, and Gregory Gray.

Officer Crockett explained that, around 6:00 a.m., the dispatcher sent him and Deputy Owens to the trailer park to investigate a call involving discharge of firearms in the vicinity of Lot Number 91.[2] When Officer Crockett arrived at the trailer park, he drove to the address. He was familiar with the area because Jean Chapel Trailer Park is a high crime area. He testified that there are daily calls from that area

---

[1]The supreme court listed the exceptions to the warrant requirement parenthetically here: investigatory stops justified by objective manifestation that the person stopped is, or is about to be, engaged in criminal activity; vehicle search supported by probable cause; standard inventory searches; searches incident to a lawful arrest; consensual searches; and searches under exigent circumstances.

[2]*See* La.R.S. 14:94(A): "Illegal use of weapons . . . is the intentional or criminally negligent discharging of any firearm . . . where it is foreseeable that it may result in death or great bodily harm to a human being."

5

reporting break-ins, domestic disturbances, gunshots, and drugs and that the calls from that location usually involve violence.

Officer Crockett averred that he was concerned and proceeded in a cautious manner due to the nature of the call. He testified that he made a loop around the trailer park and did not see anyone outside or hear any loud noises. Officer Crockett testified, however, that Deputy Owens discovered a man, Gregory Gray, Jr., walking toward the trailer park's office. When Officer Crockett arrived at that location, Officer Owens had already checked Mr. Gray for weapons.

Officer Crockett testified that, during his interview with Mr. Gray, another man, Kyle Thornton, approached them from the opposite direction. During their conversation, Mr. Thornton told Officer Crockett that he had just left a party and wanted to call a taxi. Mr. Thornton told the officers that he had not heard gunshots. Officer Crockett said that Mr. Gray declared he had been at the same party as Mr. Thornton, and Mr. Gray had just left the location where the gunshots were fired.

Officer Crockett revealed that he had contacted dispatch to determine whether there were warrants on either of the men and that he had also had the sheriff's office contact the military police to get Mr. Thornton, who was active duty military, a ride. Upon discovering an active warrant for Mr. Gray, Officer Crockett arrested him. After his arrest, Mr. Gray agreed to show the officers the trailer he had just left. Officer Crockett informed the military police that Mr. Thornton would be free to go if nothing was found in the trailer to implicate him.

Officer Crockett testified that the military police then accompanied the sheriff's officers to the trailer on Lot Number 91, as directed by Mr. Gray. Deputy Owens and the military police went to the front door while Officer Crockett went to the back. The lights were out in the trailer and one of the windows was broken, but when the

6

officers knocked, Officer Crockett heard numerous footsteps running through the trailer. The officers continued knocking, identifying themselves as law enforcement, and telling the occupants they needed to open the door.

Officer Crockett testified that Jeremy Buckner finally answered the door. During the field interview, Officer Crockett asked about the call that a gunshot had been heard coming from the trailer. Mr. Buckner replied that no one had fired a gun, that there were no firearms in the trailer, and that he had not heard any gunshots. When Mr. Buckner told the officers that he was alone in the trailer, Officer Crockett did not believe him because Officer Crockett thought he had heard more than one person moving around inside.

Officer Crockett testified that, based on the gunshot and Mr. Thornton's and Mr. Buckner's lying, he wanted to enter the trailer to determine whether someone had been injured from the gunshots. When Officer Crockett asked for Mr. Buckner's permission to enter the trailer, Mr. Buckner responded that he could not give permission because it was not his trailer. Officer Crockett explained to Mr. Buckner that he needed to enter the trailer to determine if anyone had been injured in the gunfire, so Mr. Buckner needed to get his dog under control because Officer Crockett was going to enter the trailer to perform a persons sweep.

Officer Crockett explained that the persons sweep involved entering the trailer for the purpose of identifying everyone therein. Officer Crockett testified that he did not go inside to search for physical evidence. When Mr. Buckner yelled for the dog to come, it did not, so Officer Crockett believed that something or someone was keeping the dog from going to its owner. Officer Crockett and Deputy Owens then followed Mr. Buckner into the trailer.

7

Officer Crockett recalled that the dog entered the kitchen area shortly thereafter, and Mr. Buckner picked it up. Officer Crockett explained to Mr. Buckner that he was not under arrest; however, the officers were going to detain him while they were in the trailer, and Mr. Buckner agreed. Officer Crockett removed the couch cushions and checked the area for weapons before allowing Mr. Buckner to sit on the couch. While he was in the living room, Officer Crockett noticed an open box on the floor; it held a small clear plastic bag containing two pills. Officer Crockett testified that he picked up the box and set it on the television. Deputy Owens waited with Mr. Buckner, who had been instructed to not move from the couch.

Officer Crockett averred that he made a sweep of the front bedroom and determined that it was empty of people but obviously being used. Mr. Buckner told the officers that he was staying in that room. Officer Crockett testified that he had noticed wads of cash and rolling papers on the dresser of that room and that, since he was looking for people, he checked under the bed and in the closet, but he did not search the drawers or between the mattress and box springs. Officer Crockett thought that the pills he spotted earlier were contraband, so he confiscated them when he exited Mr. Buckner's bedroom.

Officer Crockett testified that Deputy Owens told him he thought he heard somebody in the remaining bedroom. Backup deputies arrived and stayed with Mr. Buckner, so Officer Crockett and Deputy Owens continued to sweep the trailer. Officer Crockett further testified that, as he entered the kitchen, he saw what he suspected to be crack rocks in plain view on the counter top. Officer Crockett picked up a clear plastic bag lying nearby, slipped two of the rocks into it, and put the suspected contraband in his pocket. Officer Crockett stated that Deputy Owens then pointed out an empty shell casing underneath the kitchen table.

Officer Crockett testified that he and Deputy Owens next continued on to the back bedroom. On the way, the officers cleared a small laundry or bathroom area. At the closed bedroom door, Officer Crockett and Deputy Owens pulled their firearms before entering. They saw Defendant and Reggie Buckner lying on the bed and began giving loud verbal commands for the men to get on the floor and show their hands. The volume of the commands escalated as the two men did not respond or cooperate.

Officer Crockett testified that the two military police entered the trailer when they heard the loud voices. By the time the military officers arrived, Defendant had slid onto the floor. Officer Crockett holstered his firearm, and he, along with one of the military police officers, handcuffed Defendant, who was struggling: "fighting, kicking, yelling, cursing, [and] want[ing] to know why he was being arrested." To which Officer Crockett responded that Defendant was being arrested for possession of crack cocaine. Meanwhile, Deputy Owens got Reggie Buckner off the bed and handcuffed, and the officers in the living room handcuffed Jeremy Buckner.

Officer Crockett testified that he remembered that Defendant continued to struggle, balk, and even attempt a getaway after he was handcuffed. Once Defendant was outside, Officer Crockett returned to assist in handling Reggie Buckner, who was also resisting. Officer Crockett testified that he believed that Reggie Buckner did not know why the officers were present. When Officer Crockett exited the trailer, Defendant was still resisting. The military police officers were attempting to control Defendant, but Defendant was struggling with such force that they were having trouble. Officer Crockett could not assist because he and Deputy Owens were trying to control Reggie Buckner, who was also still resisting.

9

Officer Crockett testified that he called for reinforcements and that two city police units and two state trooper units arrived on the scene in response. Officer Crockett and Deputy Owens had managed to get Reggie Buckner into a car, but he kept banging his head against the car's door frame. About the time the backup arrived, Reggie Buckner broke the back window of Deputy Strother's unit with his head.

Officer Crockett averred that Deputy Strother, one of the deputies who had been watching Jeremy Buckner, also faced difficulties when Jeremy Buckner refused to get into Officer Crockett's unit. After being contained in the vehicle, Jeremy Buckner also attempted to get out of the unit in which he was placed. By this time, Defendant had made it to the roadway where the military police continued the struggle to subdue him. Officer Crockett retrieved some flex-cuffs from his car, brought them to the military officers, and instructed them to bind Defendant's feet so he would cease kicking. After trussing Defendant's ankles, the military police were able to get Defendant into a police vehicle.

Officer Crockett testified that they did not find anyone inside the trailer who had been either injured or shot. Law enforcement did not search the premises at that time. Officer Crockett observed a plastic shopping bag at the foot of steps at the trailer's entrance, and the bag held fifty or sixty of what he believed to be crack rocks. Officer Crockett testified that he wondered where they had come from and noticed that there were a number of small pieces on the stairway where he had struggled with Defendant when he was trying to remove Defendant from the trailer. Officer Crockett testified that he then called the narcotics division.

Officer Crockett remained at the site and awaited the arrival of the narcotics officers while the other law enforcement personnel transported the suspects to the

10

Sheriff's Office. Officer Crockett testified that he did not re-enter the trailer after finding the shopping bag; instead, he took pictures of the exterior of the trailer while he waited for the narcotics officers. When they arrived, the narcotics officers informed Officer Crockett that they would wait for a search warrant. Officer Crockett further testified that before leaving, however, Deputy Owens, acting on Officer Crockett's instruction, collected the spent bullet casing in the kitchen as well as one found in the roadway near the officers' vehicles.

Officer Crockett testified that he returned to the Sheriff's Office where he met with Ray Ortiz from the narcotics office. After discussing the facts of the case and Officer Crockett's reason for his actions, Mr. Ortiz typed some search warrants and field tested the samples taken by Officer Crockett. The samples tested positive for cocaine. After reviewing the search warrant affidavit, Officer Crockett found one error in that the warrant said he had thought the two pills from the box on the floor were crack cocaine. However, Officer Crockett testified that he never believed them to be crack cocaine because they were pills. Officer Crockett denied both participating in the search performed pursuant to the search warrant and to returning to the scene.

Before being dismissed from the witness stand, Officer Crockett reiterated that he went into the trailer because he felt that time was of the essence if there was someone injured in the home who needed assistance. Officer Crockett testified that he thought that he could have gotten a warrant to enter the trailer on those grounds.

The evidence submitted at the suppression hearing shows that Officer Crockett entered Defendant's domicile without permission. Defendant's home was located in an area to where Officer Crockett was frequently called out on complaints of break-ins, domestic disturbances, gunshots, and drugs. On this occasion, Officer Crockett

11

was dispatched to investigate a complaint that there had been at least one gunshot from Defendant's trailer. When he began his investigation, he interviewed a witness who confirmed that the shot came from Defendant's home.

Officer Crockett heard foot traffic within the domicile of what he believed to be more than one person, so he became more suspicious when the person who answered the door stated he was home alone. Officer Crockett attempted to obtain permission to enter the trailer, but the man, who was a resident of the home, denied permission. Officer Crockett entered the domicile anyway to conduct a persons sweep on the belief that he needed to make sure none of the other occupants were injured. In the course of conducting the persons sweep, Officer Crockett observed what he believed to be illicit narcotics and confiscated samples thereof.

In the course of arresting Defendant for the drugs in the trailer, more narcotics fell out of Defendant's clothing. Based on Officer Crockett's observations and a field test of the sample contraband he seized, a narcotics officer applied for and received a warrant to search Defendant's residence.

The first circuit has found that an officer's warrantless and nonconsensual entry into someone's home to retrieve a loaded handgun qualified under the exigent circumstances exception. *State v. Brumfield*, 05-2500(La.App. 1 Cir. 9/20/06), 944 So.2d 588, *writ denied*, 07-213 (La. 9/28/07), 964 So.2d 353. In that case, the defendant used the firearm in a crime and stashed it in a residence wherein children resided. *Id*. After arresting the defendant, the officer justified his subsequent entry into the home and search by stating his concern for the safety and welfare of the children living therein. *Id*.

In *State v. Ledford*, 40,318, p. 1 (La.App. 2 Cir. 10/28/05), 914 So.2d 1168, 1170, deputies responded to a report that a man and a woman were fighting in the

12

yard in front of a residence. When the officers arrived, the woman, who had a small amount of blood on her face, was still in the yard, but the defendant was gone. *Id.* The woman informed the deputies the defendant had fled into the woods when he saw that law enforcement was approaching. *Id.* The officers asked for permission to enter the residence, but the woman, who was a resident, denied permission. *Id.* The deputies entered the residence anyway and discovered a small amount of marijuana on a bedroom table. *Id.* The officers cited their concern for the woman's safety and belief she might be lying about the defendant not being in the trailer as their basis for the warrantless and nonconsensual entry. *Id.* The first circuit determined that; based on the location of the altercation, the woman's assurances the defendant was not in the residence, and the lack of any report that the defendant was armed; the officers did not have the necessary probable cause to enter the residence. *Id.* at 1173.

In *State v. Divers*, 38,524 (La.App. 2 Cir. 11/23/04), 889 So.2d 335, *writ denied*, 04-3186 (La. 4/8/05), 899 So.2d 2, *cert. denied*, 546 U.S. 939, 126 S.Ct. 431 (2005), the defendant, who was living in Texas, was suspected of murdering two men in Louisiana; he had been living with his girlfriend in an apartment leased by a second woman, Sharon Felder. After the date of the murders, the defendant began driving a small white car, and he initially told Ms. Felder his uncle had given him the car, but he later changed the story to say he had gotten it from two men. *Id.* When Ms. Felder learned the police had towed the car, she became frightened and did not return to her apartment. *Id.* In looking for the defendant, the police went the apartment complex where the officer manager, who was concerned because she had not seen Ms. Felder that day, gave them permission to enter Ms. Felder's apartment. *Id.* The officers found the defendant's girlfriend asleep in one bedroom, and she told them there was no one else in the apartment. *Id.* Law enforcement continued to

search, found the defendant hiding in a closet, and arrested him. *Id.* The second circuit found this satisfied the exigent circumstances exception to the warrant requirement: "Given the grave and immediate concerns that Ms. Felder was in imminent peril, the police had exigent circumstances to enter her apartment, at the request of her apartment manager, and to search for her without a warrant." *Id.* at 356.

Thus, we find that the trial court properly denied suppression of the evidence seized immediately after the officers' warrantless entry because the officers had probable cause to fear for the safety of the trailer's occupants. We note that Defendant does not contest the validity of the search warrant or assert that the officers executing the warrant, who were different from those initially involved, did not have a good faith belief in its validity. *See State v. Long*, 03-2592 (La. 9/9/04), 884 So.2d 1176, *cert. denied*, 544 U.S. 977, 125 S.Ct. 1860 (2005) (discussing the good faith except to the exclusionary rule in cases where the search warrant is invalid).

It appears that, other than the drug samples taken by Officer Crockett and the bullet casings seized by Deputy Owens, the bulk of the evidence; i.e., crack cocaine, firearms, and drug paraphernalia; was seized pursuant the subsequently issued search warrant. This court finds that the arguments regarding the evidence seized pursuant to the search warrant have been abandoned. Therefore, even if the evidence seized by Officers Crockett and Owens was suppressed, there is sufficient evidence before the court to support the conviction. Uniform Rules–Courts of Appeal, Rule 2-12.4.

For the reasons asserted herein, we find that Defendant's assignment of error lacks merit.

14

**DECREE**

For all of the foregoing reasons, Defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal. Rule 2-16.3.